# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | CRIMINAL NO. 1-21-cr-28-7 (APM) |
| : | |
| LAURA STEELE : | |
| : | |
| _____ : | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Laura Steele, through undersigned counsel, submits this sentencing memorandum to aid the Court at sentencing. Following a jury trial, Ms Steele was found guilty of: (1) 18 U.S.C. 1512(k); Conspiracy to Obstruct an Official Proceeding, (2) 18 U.S.C. 1512(c)(2), 2, Obstruction of an Official Proceeding, Aiding and Abetting. (3) 18 U.S.C. 372, Conspiracy to Prevent Members of Congress from Discharging their Duties, (4) 18 U.S.C. 1362, 2; Destruction of Government Property, (5) 18 U.S.C. 1752 (a)(1); Entering or Remaining Restricted Building or Grounds, (7) 18 U.S.C. 231(a)(3), 2; Obstructing Officers During a Civil Disorder, and (8) 18 U.S.C. 1512(c)(1), 2; Tampering with Document or Proceedings. Based on the facts and arguments below, Ms Steele requests the Court sentence her to six-months of home detention on each count running concurrently, followed by a period of supervision to include community service; supervision to convert to unsupervised upon completion of community service. We submit that this sentence would most accurately address the concerns of the sentencing statute, 18 U.S.C. §3553.

As is our practice, we are not going to belabor the Court with a recitation of the information contained in the Presentence Report. Rather we will contain our remarks to factors we feel pertinent and relevant to the Court's sentencing calculus outside of that document, focusing on Ms

Steele's actions and memories of the events of 6 January 2021, and perspective on her position over two years later.

### Prologue to 6th January.

Laura Steele was a supporter of former President Trump. She voted for Trump in both 2016 and 2020. She had believed in him back in 2016 and felt as re-election loomed he'd earned her vote for another term in office. The events of the latter part of 2020 took a very strange undertone though. In the period leading up to the election, perhaps reading the political tea-leaves , the former president claimed were he to lose this election, this could only happen if election fraud were to take place. This meme was bombarded across right-wing media.

A sad indictment of our times is media outlets have become increasingly polarized and seek not to *inform* their respective audiences, rather cater to the already-apparent biases of their target demographic. In response, it is natural for the audience, hearing what they want to hear, to become increasingly fervent having their particular suspicions and fears buttressed. No one likes to lose, and reassuring any crowd that *if we lose its because we were cheated* is an incredibly powerful narcotic, and this message struck a resonant chord with the right-wing faithful. As the first Tuesday in November approached, the message of potential voter-fraud to the devoted increased to frenetic levels: The scene was set for discord. Trump constantly stoked the fires claiming there was an organized effort from his adversaries to "steal" the election. This was nuclearized with the message that the conservative vote as a whole was being neutralized. Again, the message resonated. Moreover. in addition to the media, the circles and friends one encounters also has a strengthening factor to personal beliefs. All this combined, and on the eve of the election the stage was set; the powder was primed.

3rd November arrived. The country watched with bated breath as America went to the polls. Tuesday evening turned into Wednesday; the nation perched on the edge of its seat as the election

leaned towards Biden. The right-wing media went into overdrive. It didn't help that recount after recount left us 4 days without a decision, but by Saturday the result was called. The effect of this four-day delay only served to ramp-up the tensions and fears as the faithful watched what appeared to be Trump's prediction coming to pass. In the wake of the result, an explosion of frenzy followed with court cases, recounts, protests of cheating screamed from the rooftops. The new meme of "Stop the Steal" took over the airwaves. As court case after court case collapsed, as recount after recount confirmed the returns, and as state after state refused to nullify their results, the options for the faithful dwindled. 6th January 2021 was the scheduled date for Congress to exercise its two-hundred-year-old constitutional duty in certifying the votes of the Electoral College, and this date quickly became the new focal point. Trump called for a huge rally for that day, and the MAGA hats responded.

### 6th January, 2022

As the day approached, Laura Steele considered the situation. She had observed the last eight weeks frenzy and outrage from the outlets. She had discussed the events with her close friends, relatives, and contemporaries. As mentioned, over the course of his presidency Laura had viewed him to be a good man and a president worthy of a return to office. She was aware of the upcoming rally and discussed attending with friends and relatives. Fate was to intervene. Laura's brother, Graydon Young, sounded her with a proposition. He had become affiliated with the Oath Keepers organization in Florida. He told Laura that the Oath Keepers had been approached with a request to provide security services for various dignitaries and VIPs at the events planned for the 6 January rally. Given Laura's 11-year experience as a police officer, he suggested she would be a valued addition and encouraged her to join. This was her first contact with the organization. She agreed. The plan was for Graydon to travel to North Carolina, from where they, along with several friends would drive to DC.

The party left for DC on the Tuesday the 5th, arriving in the NoVA area, Springfield specifically, that afternoon at a hotel reserved by Graydon. In the evening they took a quick walking tour to familiarize themselves with the area and Metro, and following dinner, turned in to get some rest for the following day.

The next morning, Laura and Graydon made their way downtown: Graydon leading the way as he was the one in contact with other Oath Keepers. They exited the Metro at Federal Triangle and arrived to meet with the others on the site of the rally facing the south side of the Whitehouse. The rally went off without a hitch, and then the word was passed down that the group was to escort some VIPs to the area around the U.S. Capitol building. The group began the trek down Pennsylvania Avenue.

As they joined the crowd at the Capitol, the group paused. Laura wandered off slightly to get a better look at the scene. The group reconvened and someone mentioned they were going in, and to stick together—There was some allusion to anti-protesters in the vicinity. They were at the bottom of the steps on the north-east corner of the building. The group formed into a line. Laura saw her brother, the only person there she knew, get in-line. She made the fateful decision to follow. She knows had she not put her hand on the person-in-front's shoulder, we wouldn't be here today. The line ascended the steps and entered through an open door. Laura followed. Inside, the group split into two: one headed to the House side, one to the Senate. Again, Laura followed her brother.

Before moving on, Laura Steele would like to be clear about this idea of being carried along. Ms Steele is not, and has never, asserted that she entered the Capitol that day being coerced by anyone, or being forced, or not of her own will. Quite the opposite. But her understanding of the basis for being on the Hill and entering the building was not to engage in any nefarious conduct, but rather to help those in need of assistance. Indeed, this belief had not changed since her original

PeterCooperLaw

4

agreement to come to DC with her brother. As people went into the building, she went along. She recognizes and accepts responsibility for these decisions, but remains of the belief that there was no criminal intent on her part, nor of anyone around her to discern.

After a short period of time it had become clear to the group that there was no one in real need of their services, and decided it was time to leave. The group reconvened on the East Plaza, and, after a few minutes, broke up and went their separate ways. Laura remembers the growing feeling of disquiet on her part. This wasn't helped by her brother's rather more bombastic descriptions of his part in "The Storming." For her, that was not what she had signed up for nor experienced. She had zero desire to be associated with any "storming," and as she described her experience to others, and while she was unaware of what had transpired at other locations in and around the building, but hearing reports of what had taken place, the gravity of what had transpired set in, and the feeling that things would never be the same again was inescapable.

**The Present Day.**

Laura Steele looks back at the events of 6th January 2021 with regret. She feels regret from several angles. First, she expresses remorse for her actions that day. In going to the Capitol, she had no intent to engage in any of the behavior that rose to the level we all experienced. The environment she found herself in was animated to say the least and she found herself being swept along, both emotionally in the mentality of the mob and physically in the manner in which she found herself in the Capitol building itself. As we have mentioned, that is not to say that she was coerced but rather the frenzy left little time for self-reflection: the self-reflection she now employs. She looks back and understands the gravity of being inside the building; what it meant. It brings home this went way beyond her initial intent. It is the trigger of why she felt the need to get out as quick as she could. She wishes she'd encountered that epiphany before things got out of hand. She

knows that despite a lack of any underlying malevolence, or any preconceived plan to alter the election, or even to *fight like hell*, her actions crossed a line, and she accepts responsibility for this.

Secondly, she feels sadness at the manner that the day is now perceived. She came to DC with the honorable intent of displaying her support for the outgoing president and providing protection services to others. Throughout the Capitol building area, events span out of control. The nature of the violence the nation witnessed has cast a pall over anyone who attended that day, and that is something she will take a long time to get over. She believes the events of that day may even come back to haunt the ex-president, and that certainly is contradictory to the main reason she travelled to DC.  She has been approached on several occasions by media to provide her side of events, but has declined to do so. Quite simply her experiences on that day have left an indelible sour taste in her mouth and she wants to put it in the past and close the door as quickly as possible. She is very frightened or what could happen to her at sentencing but she wishes to make the Court aware that she knows she's here based on her own actions and takes responsibility.

**Sentencing Factors.**

18 U.S.C. §3553 provides:

**(a) Factors To Be Considered in Imposing a Sentence.**—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
> **(2)** the need for the sentence imposed—
>> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> **(B)** to afford adequate deterrence to criminal conduct;
>> **(C)** to protect the public from further crimes of the defendant; and
>> **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Addressing these factors individually we find the following. Nature and circumstances of the offense with respect to this offense is a very combustible issue, and we will return to it later. On history and characteristics of the defendant there is not much debate. Ms Steele has no criminal history, indeed this is her first encounter with the criminal justice system. Her background displays an individual who has not only led a completely law-abiding existence prior to the events bringing her here, but is an eleven-year veteran police officer. Moreover, her husband is the retired police chief of her town and her two sons currently serve in that same department. Subsection (2)(A) discusses seriousness of the offense, respect for the law, and just punishment for the offense. We will return to this also when we discuss nature and circumstances of the offense. Subsection (B) contemplates adequate deterrence to criminal conduct. She has been emotionally shaken by these experiences with the justice system, and the insight she has acquired has left her with the strongest of convictions that this will be her last. Incarceration is not necessary to make that point. Subsection (C) considers a similar idea as that in (B), in protecting the community from further criminal contact. Here we point out Ms Steele is as far from being a career offender as is possible and, again, given her experiences here, the public has nothing to fear from Laura Steele in the future. With respect to Subsection (D), quite simply Ms Steele has no need of any of the services available to U.S. Probation. Which brings us back to sections (1) and (2)(A).

Returning to the nature and circumstances of the offense we find in these matters this is a not a simple issue to unpack. On the one hand, the specific conduct and decisions Laura accepts responsibility for, in the universe of criminal conduct, are not the most egregious considered by these courts. However, taken into context with the much larger events of 6 January, the nature and circumstances question becomes much less clear. There is no question the events of that day have left a deep scar on the national psyche. Seditionary behavior has in some cases been charged and convicted. But we ask the Court to take note that Ms Steele is one of a small group of people who

despite having gone down the regrettable road of entering the Capitol realized it was not the place to linger and got out as quickly as possible. We ask the Court to recognize that even at what appeared to be the point of no return, this was a Rubicon she made every effort to back away from. We ask the Court to view her actions against the backdrop of those with more sinister intentions as proof of her original harmless purpose and sentence her accordingly.

Addressing (2)(A), we have already discussed Ms Steele's view of the rioters' actions being contrary to the best interests of the country, but he also views those acts as not being true to one of her core values of respect towards law and order. We highlight to the Court that despite the personal views of some individuals associated with Oath Keepers, prior to January 6 there was no suggestion that this organisation encouraged civil disobedience, advocated overthrow of the government, displays extremist right-wing views, or has encouraged in any way violence of the nature on display on 6th January. Ms Steele joined to promote the very opposite. Respect for the law—Making the environment safe for others. These are the views of an eleven-year veteran police officer. In terms of any sense of danger to the community, there is simply non: it does not exist. The Court should have no concerns as to her views on the respect for law either today or for the future.

The final issue §3553 to be discussed is the last part of (2)(A): just punishment for the offense. At its heart, this is the very central issue for this Memorandum as a whole. Ms Steele is a law-abiding citizen, police officer veteran, who placed herself in the wrong place at the wrong time. She came to DC to provide a service based on her training and experience, and quickly found himself in the middle of an escalating situation in which speech, free or not, was being dropped as a form of expression by a mob, spinning out of control, where rage was taking over. She has been shattered at the fallout from that day. Her life will never be the same again. This, in and of itself, is more than adequate punishment. In no way, shape or form should the Court be under the

impression that a departure sentence would be seen as getting away with anything. For the rest of her life Laura will forever be associated with the events of that day, and she takes this to heart. Given all discussed above, including the fact of his decision to disengage when he did, we ask the Court to sentence in accordance with our proposal.

### Sentencing Enhancements.

In her sentencing memorandum, Connie Meggs provides substantial legal arguments why the Court should decline to impose any of the potential sentencing enhancements in these matters. Again, we will not belabor the Court with a repetition of those extensive arguments, but will join and adopt her submissions. However, we would take a few lines to discuss Laura Steele's specific situation vis-à-vis these concerns.

With respect to USSG §2J1.2(b)(1)(B), Ms Steele echoes Ms Meggs' arguments as to the inapplicability of this provision regarding the events of that day. This is repeated for USSG §2J1.2(b)(2). We join in highlighting to the Court how other courts have assessed and ruled on this matter. Considering USSG §2J1.2(b)(3), Ms Steele reminds the Court there was no evidence that she had any input or even knowledge that other members of the organisation were planning/preparing anything with respect to the Quick Reaction Force (QRF). The evidence showed she had no contact with those individuals prior to January 6. She stayed in a different hotel in a completely different part of Virginia and had no contact whatsoever prior to arriving at the Ellipse for the rally. Finally, in addressing USSG §3C1.1, Ms Steele reminds the Court that the government charged Ms Steele with destruction of items at her house, yet provided no evidence that she in fact did so.

### Conclusion

Taking all the above into account. We ask the Court to provide the following sentence. We submit a 6-month period of home detention on each count, followed by a period of supervision to

include community service; supervision to convert to unsupervised upon completion of community service. We believe the community would benefit far more from her service than her incarceration. We believe this sentence to best satisfy the concerns of 18 U.S.C. §3553.

/s/ *Peter A. Cooper*

Peter Cooper; 478-082
Counsel for Laura Steele
400 5th Street NW.
Washington DC 20001